OPINION OF THE COURT
Jasen, J.
These appeals raise a number of issues concerning tax assessment review proceedings under article 7 of the Real Property Tax Law. The primary question presented is whether a court may grant a preliminary injunction restraining a municipality from transferring title to real property acquired by the municipality by virtue of nonpayment of taxes during the pendency and final determination of proceedings to reduce the tax assessment on that property.
*505 These consolidated tax review proceedings involve two parcels of commercial property located in the downtown Syracuse business district. This area has been and continues to be a hotbed of tax litigation. Cases involving the properties involved herein, as well as other parcels of real estate in this district, have been in our courts on a unmber of occasions already (see Matter of Rice v Srogi, 70 AD2d 764; McCrory Corp. v Gingold, 52 AD2d 23; Guth Realty v Gingold 41 AD2d 479, affd 34 NY2d 440; Matter of Guth Realty v Gingold, 16 AD2d 372), and there presently are pending over 150 applications seeking review of other assessments imposed by the City of Syracuse.
The instant proceedings were brought to review assessments for the years 1971-1976 on two separately owned parcels. The first of the two properties is located at 323 South Salina Street in Syracuse and will be referred to as the “Guth” property. The second property is located at 425-427 South Salina Street and will be referred to as the “Grant” property.
The Guth property is located in the 300 block of South Salina Street. It is improved by a five-story building which is approximately 80 years old. The prior owner, Ed Guth, purchased the property in 1955 and used the building to house a hobby shop and toy store until 1974 when he sold the property to Franchise Realty Interstate Corp., the real estate division of the McDonald’s Corporation.
Mr. Guth previously had offered this property for sale from as early as 1962, but apparently had received no purchase offer worth considering until that of Franchise Realty. The original offer by Franchise Realty was for $130,000, but the price was negotiated upward to $150,000 when the property was finally sold. At the time of this sale, Mr. Guth had no connection with Franchise Realty. Moreover, Mr. Guth was in sound financial condition at the time, but had decided to give up his business because of declining sales and the high cost of operation.
After Franchise Realty purchased the Guth property, an arrangement with a prospective McDonald’s licensee who was to occupy the building fell through. As a result, the property remained vacant and Franchise Realty offered it *506 for sale. Franchise Realty, however, has been unsuccessful in obtaining a purchaser for the Guth property.
Despite two prior proceedings which resulted in substantial reductions in tax assessment (Guth Realty v Gingold, 41 AD2d 479, affd 34 NY2d 440, supra; Matter of Guth Realty v Gingold, 16 AD2d 372, supra), the city continually assessed the Guth property at $212,200 each year from 1964-1974. In 1975 and 1976, the city assessed the property at $180,200.
The Grant property is located in the easterly half of the 400 block of South Salina Street. The property originally was owned by the University of Rochester and was leased to the W. T. Grant Company in 1944 for a 30-year term which was later extended to 1982 with an option to renew until 2043. Aside from the annual base rent of $77,322.32, Grant was to pay all taxes, utilities, insurance and building maintenance. Grant constructed a five-story building on the property which it sold to and then leased back from the University of Rochester. Each year since 1964, the city has assessed the property at $1,135,700.
Because of declining sales volume, Grant decided in 1974 to close its store. Shortly thereafter, Grant was persuaded to remain open by an agreement with the University of Rochester and the City of Syracuse under which the university deferred the annual rent and the city settled the 1964-1970 tax litigation then on appeal. (See McCrory Corp. v Gingold, 52 AD2d 23, 25, supra.) In 1976, however, the tenancy ended when the Grant chain went bankrupt and vacated the premises.
The University of Rochester sold the Grant property in late 1976 to South Salina Street, Inc., for the sum of $25,-000. South Salina Street, Inc., agreed to assume liability for the unpaid 1976 taxes, penalties and interest on the property, thereby making the total consideration for the transfer $175,774.32. South Salina Street, Inc., however, failed to pay the 1976 taxes and has since failed to pay taxes for the years 1977-1979. Pursuant to the city’s tax act (L 1906, ch 75, §§ 21,22, as amd by Local Law, 1944, No. 1 of City of Syracuse), tax sales were conducted with respect to the *507 1976-1978 tax delinquencies. South Salina Street, Inc., did not redeem the premises for the 1976 delinquency (see Real Property Tax Law, § 1010) and on April 9, 1979, the city acquired title to the Grant property pursuant to a tax deed.
In the meantime, tax proceedings were instituted to review assessments on the Grant property for the years 1977-1979. These proceedings are still pending and are not presently before us on these appeals. However, in the context of these proceedings, South Salina Street, Inc., in May of 1979, sought and obtained a preliminary injunction from Special Term restraining the city from transferring title to the Grant property until final determination of the tax assessment review proceedings for the years 1976-1979. It is the issuance of this injunction which is presently before our court on one of these appeals.
As mentioned earlier, these proceedings were commenced to review assessments on the Guth and Grant properties for the years 1971-1976. These proceedings were tried jointly with three others which also involved properties in the downtown Syracuse business district. The parties stipulated to the applicable equalization rates and, therefore, trial was held solely to determine the full values of the properties in question.
At trial, testimony was taken from appraisers for the various petitioners and from the city’s appraiser. In regard to the Guth property, petitioner’s appraiser valued the property for the years 1971-1976 at prices ranging between $180,000 to $140,000. The city’s appraiser testified that the full value of the property was a low of $460,100 in 1970 and a high of $487,800 in 1976.
The trial court, acknowledging the general decline of property values in the downtown Syracuse area, found the value to be between those set forth by the parties’ appraisers. Full value for the years 1971-1972 was found to be $300,000, for 1973-1974 to be $275,000, and for 1975-1976 to be $250,000 and the assessments were ordered reduced accordingly. The trial court did not consider the 1974 price of $150,000 at which the Guth property was sold to Franchise Realty to be controlling because, although it was an *508 arm’s length transaction, the court was of the view that the sale was “occasioned by the willingness of the owner to sell at a sacrifice.” This conclusion was based upon Mr. Guth’s desire “to discontinue business at that location due to the fact that he considered the expense of operation did not justify continuing business there.”
There was also much disagreement at trial as to the value of the Grant property. The petitioner’s appraiser testified that the property had a full value of $1,200,000 in 1971 which declined annually to $625,000 in 1976. On the other hand, the city’s appraiser stated that the value of the property ranged between $3,028,200 to $3,150,700 during the years in question. This discrepancy in valuation apparently was caused by the different appraisal methods utilized. The city’s appraiser adopted a method whereby estimated rental income, which was ascertained from comparable leases in the area, was capitalized at 9% and then added to the land values to determine the full value of the property. The petitioner’s appraiser postulated that reasonable rental income could be determined by multiplying gross sales by a factor of 3%, representing the rent which a national chain store would agree to pay on a percentage lease, and capitalizing the result at 9.25% to 12.2%, the expected rate of return on such an investment during the years in question.
The trial court again found that full value was between those alleged by the parties. Full value for the years 1971-1972 was found to be $1,830,000, for 1973-1974 to be $1,670,000, and for 1975-1976 to be $1,510,000, and the assessments were ordered reduced accordingly. Although indicating approval of the petitioner’s gross sales valuation method, the trial court did not expressly accept these figures in arriving at its valuations, stating generally that the petitioner’s method failed to take into consideration long-term market conditions as a determining factor of property value.
On cross appeals, the Appellate Division unanimously modified by further reducing the assessments below that set by the trial court. As to the Guth property, the Appellate Division held that the trial court erred in not giving the 1974 sales price paid by Franchise Realty controlling *509 weight for purposes of determining full value. The Appellate Division viewed the 1974 sale neither as being made under any compulsion nor occasioned by any abnormal impetus for selling. As such, the Appellate Division stated that the $150,000 sales price was entitled to full weight in determining value for purposes of the tax assessment on the Guth property.
The Appellate Division also further reduced the Grant assessment. Noting that the trial court did not set forth the computations it used in determining value, the Appellate Division adopted the petitioner’s valuation method which used a capitalized percentage of gross sales “because that is the method normally used by national tenants and also because of the difficulty that the city appraiser had in finding credible, comparables to support his square-foot rental formula.” The Appellate Division, however, declined to accept the petitioner’s figures for 1974-1976 because of Grant’s failing financial condition and, therefore, projected the 1973 valuation over these years.[1]
The Appellate Division also affirmed Special Term’s grant of the preliminary injunction restraining the city from disposing of title to the Grant property pending final determination of the 1976-1979 assessment review proceedings. The court held that such a remedy should only be available in instances where a taxpayer can demonstrate “a long and aggravated pattern of conduct by the city from which the taxpayer cannot reasonably protect itself or its property without injunctive relief.” The Appellate Division was of the view that the continuous overvaluation of the Grant property in the face of court rulings that the assess *510 ments were illegal, coupled with the excessive delays caused by the city in the course of the assessment review proceedings, was such conduct as justified the grant of a preliminary injunction to prevent the loss of title to the Grant property pending final determination of the taxes owed.
On cross appeals to this court, both parties assert that the awards of costs and allowances to petitioners, as modified by the Appellate Division, are in error. The commissioner also contends that the Appellate Division erred in further reducing the assessments on the Guth and Grant properties. Finally, the commissioner maintains that Special Term was without legal authority to issue the preliminary injunction against the City of Syracuse in the context of a tax assessment review proceeding. Alternatively, the commissioner argues that if the court had the power to issue the injunction, Special Term abused its discretion by issuing the injunction under the facts of this case.
We first dispose of the valuation issue. In assessment review proceedings, the value at which real property may be taxed has been equated with market value. (Matter of Great Atlantic & Pacific Tea Co. v Kiernan, 42 NY2d 236, 239; Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, mod 39 NY2d 920; People ex rel. Parklin Operating. Corp. v Miller, 287 NY 126, 129; Matter of Board of Water Supply of City of N. Y., 277 NY 452, 456-457; Matter of Lane Bryant, Inc. v Tax Comm. of City of N. Y., 21 AD2d 669, affd 19 NY2d 715.) The “market value of real property is the amount which one desiring but not compelled to purchase will pay under ordinary conditions to a seller who desires but is not compelled to sell.” (Heiman v Bishop, 272 NY 83, 86; see, also, Sparkill Realty Corp. v State of New York, 254 App Div 78, 82, affd 279 NY 656.)
The determination of market value essentially is a question of fact. As such, the Appellate Division is empowered to make new findings of value where the trial court “ ‘has failed to give to conflicting evidence the relative weight which it should have’ ”. (People ex rel. MacCracken v Miller, 291 NY 55, 61, citing Matter of City of New York [Newton Creek], 284 NY 493, 497; see Real Property Tax Law, § 724.) Furthermore, where the Appellate Division *511 reverses the findings of value made by the trial court and makes new findings of fact, the Court of Appeals is empowered to choose between the findings of the trial court and the new findings of the Appellate Division by ascertaining which valuation is in accord with the weight of the evidence. (People ex rel. MacCracken v Miller, supra; People ex rel. Hilton v Fahrenkopf, 279 NY 49, 53; 24 Carmody-Wait 2d, NY Prac, §§ 146:126,146:127, pp 352-354.) We affirm the Appellate Division’s reduced valuations of both the Guth and Grant properties.
The reason for the Appellate Division further reducing the valuation of the Guth property was the 1974 sale to Franchise Realty. The general rule as to such sales is “that the purchase price set in the course of an arm’s length transaction of recent vintage, if not explained away as abnormal in any fashion, is evidence of the ‘highest rank’ to determine the true value of the property at that time”. (Plaza Hotel Assoc. v Wellington Assoc., 37 NY2d 273, 277; Matter of Woolworth Co. v Tax Comm. of City of N. Y., 20 NY2d 561, 565; cf. Matter of Great Atlantic & Pacific Tea Co. v Kiernan, 42 NY2d 236, supra.) The Appellate Division correctly concluded that the 1974 sale to Franchise Realty fit within this general rule.
Mr. Guth had offered the property for sale without success for 12 years. When finally sold, negotiations took place which resulted in a $20,000 increase in the purchase price. At the time of the sale, Mr. Guth was financially secure and his business was doing moderately well. Moreover, as mentioned earlier, Mr. Guth had no interest in or connection with the purchaser, Franchise Realty. After the sale, Franchise Realty unsuccessfully offered the property for sale at a price identical to that at which it was purchased. Under these circumstances, the sales price established in this arm’s length transaction was the best evidence of the value of the Guth property during the years in question and, therefore, the Appellate Division’s further reduction based on this price was justified.
We also agree with the Appellate Division’s reduced valuation of the Grant property. As mentioned earlier, the use of different methods of appraisal for this property *512 reaching, as they did, such broadly disparate results, apparently prompted the trial court to accept neither approach. However, the trial court failed to state how it arrived at its computations of value.
The Appellate Division, on the other hand, chose to accept petitioner’s appraisal method because it produced figures which more closely reflected the value of the property to a national tenant. The Appellate Division was also cognizant of Grant’s deteriorating financial condition during the years in question and appropriately rejected petitioner’s figures based upon gross sales for the years immediately prior to Grant’s bankruptcy. Finally, as noted by the court below, the city’s appraiser was hard pressed to justify the comparable leases he used in computing the estimated net income of the Grant property. Under these circumstances, we are of the view that the Appellate Division’s determination of the market value of the Grant property was more realistic than that of the trial court and more in line with the weight of the evidence.
The commissioner asserts, however, that even if the Appellate Division was correct in further reducing the assessments on the Guth and Grant properties, the court erred by granting the taxpayers relief in excess of what was requested in their various petitions. In support of his position, the commissioner relies primarily on the case of People ex rel. Interstate Land Holding Co. v Purdy (206 App Div 606, affd 236 NY 609). In Purdy, a closely divided court affirmed a decision in which the Appellate Division held that relief in a tax review proceeding is limited to the amount requested in the petition. (Accord People ex rel. Universal Business Corp. v Lewis, 242 App Div 888, affd 267 NY 617; but see People ex rel. Empire Mtge. Co. v Cantor, 198 App Div 317; People ex rel. Congress Hall v Ouderkirk, 120 App Div 650.) We believe that the time has come to overrule the Purdy decision.
In New York, both by statute (Real Property Tax Law, § 306) and under our Constitution (NY Const, art XVI, § 2), real property may not be assessed in excess of its full value. Indeed, it is the very purpose of a tax review proceeding “to arrive at a fair and realistic value of the prop *513 erty involved.” (Matter of Great Atlantic & Pacific Tea Co. v Kiernan, 42 NY2d 236, 242, swpra; see, also, Matter of Merrick v Board of Assessors of Nassau County, 45 NY2d 538.) Moreover, because the Real Property Tax Law relating to assessment review proceedings is remedial in character, it should be construed in such a way that the taxpayer’s right to have his assessment reviewed and the appropriate relief granted should not be defeated by a pleading technicality. (Matter of Great Eastern Mall v Condon, 36 NY2d 544; People ex rel. New York City Omnibus Corp. v Miller, 282 NY 5, 9.)
It has long been the rule that the primary purpose of the tax petition is to give notice to the taxing authority so that it may take such steps as may be advisable to defend the claim. (Stuyvesant v Weil, 167 NY 421, 425; Foley v D’Agostino, 21 AD2d 60, 62-63.) That being the case, where adequate notice has been given, we see no good reason to adhere blindly to a rule which precludes a court from granting the relief justified by the proof. Aside from being prevented from collecting a tax which has been found to be excessive, the commissioner has not alleged, let alone proven, any prejudice suffered by the city as a result of the assessments being reduced below the amounts requested in the petitions. It is consistent with the general purpose of these proceedings and with the legislative mandate that property not be assessed in excess of full value that relief not be limited to the reduction claimed in the petition. Thus, we hold that where the evidence establishes a value lower than that alleged in the petition, a court can reform the petition to conform with the proof and order the appropriate reduction.[2]
*514 Having affirmed the Appellate Division’s reduced valuation, we now address the propriety of awarding petitioners costs and allowances. The trial court granted costs and allowances to the Guth and Grant petitioners under subdivisions 1 and 2 of section 722 of the Real Property Tax Law. The trial court also awarded petitioners an additional allowance pursuant to CPLR 8303 (subd [a], par 2). On appeal, the Appellate Division affirmed the award of costs and disbursements under subdivision 1 of section 722 of the Real Property Tax Law and modified the additional allowance award by reducing it to the $2,500 maximum authorized by subdivision 2 of section 722 of the Real Property Tax Law. The Appellate Division, however, struck out the additional allowance awarded under CPLR 8303 on the ground that petitioners could only recover costs and allowances as permitted by the Real Property Tax Law. We agree with the Appellate Division’s disposition of costs and allowances.
Contrary to the commissioner’s assertions, there is no basis upon which to upset the awards under section 722 of the Real Property Tax Law. The petitioners were successful in reducing their assessments by more than one half of the reductions they claimed and, therefore, they were entitled to costs and disbursements for the proceedings as of right. (Real Property Tax Law, § 722, subd 1.) Similarly, the record supports the findings that the assessments were “increased without adequate cause” subsequent to court orders of reduction in the case of the Guth property and after stipulation in the case of the Grant property. Therefore, the petitioners qualified for additional allowances under subdivision 2 of section 722 of the Real Property Tax Law.
We also agree with the Appellate Division that petitioners were not entitled to the discretionary allowance authorized by CPLR 8303 (subd [a], par 2). As a general rule, there should be no resort to the provisions of the CPLR in instances where the Real Property Tax Law expressly covers the point in issue. (CPLR 103, subd [b]; Matter of Trustees of Sailors’ Snug Harbor v Tax Comm. of City of N. Y., 26 NY2d 444, 450; People ex rel. American *515 Sugar Refining Co. v Sexton, 274 NY 304; Matter of Stevens Med. Arts Bldg. v City of Mount Vernon, 72 AD2d 177, 182.) In this regard, it is interesting to note that the predecessor statute to CPLR 8303 expressly provided that it was inapplicable to tax assessment review proceedings. (L 1934, ch 361; Civ Prac Act, § 1513.) However, when this section was carried over into its present form in the CPLR, reference to the Real Property Tax Law inexplicably was deleted.
Notwithstanding the apparent ambiguity created by this omission in CPLR 8303, we agree that section 722 of the Real Property Tax Law provides the exclusive additional allowance in assessment review proceedings. Indeed, subdivision 2 of section 722 of the Real Property Tax Law states that “the court shall award to the petitioner an additional allowance, not exceeding the amounts hereinafter specified”. (Emphasis supplied.) This language, in our view, indicates that the Legislature intended that the allowance provision in section 722 of the Real Property Tax Law would supersede the additional allowance authorized by CPLR 8303 (subd [a], par 2). Thus, we affirm the holding below that an additional allowance pursuant to CPLR 8303 (subd [a], par 2) may not be granted in an assessment review proceeding. (Accord Matter of Jacobs v Board of Assessors of Town of Elma, 73 AD2d 810; Matter of Rice v Srogi, 70 AD2d 764, supra; see 24 Carmody-Wait 2d, NY Prac, §§ 146:17, 146:20.)
We conclude by addressing the propriety of granting the preliminary injunction against the City of Syracuse. As mentioned earlier, this injunction was obtained by South Salina Street, Inc., and restrained the city from transferring title to the Grant property until the 1976-1979 assessment review proceedings were completed. We hold that while a court has the power to enjoin a municipality from transferring title to property acquired for nonpayment of taxes during the pendency of an assessment review proceeding, it was error under the circumstances present in this case for Special Term to do so.
It is well established that one challenging a tax assessment must continue to pay his taxes and that the *516 commencement of an assessment review proceeding does not stay the collection of taxes or enforcement procedures instituted by the taxing authority. (Real Property Tax Law, § 704, subd 3; see People ex rel. Manhattan Ry. Co. v Coleman, 48 Hun 602; People ex rel. New York El. Ry. Co. v Coleman, 48 Hun 620.) The reason for this rule is readily apparent. A government must function and to that end it must have funds. Restraints on the exercise of the taxing power would impede the progress of government and deprive it of the moneys it needs to provide essential services to the public. Thus, a municipality ordinarily should not be denied or delayed in the enforcement of its right to collect the revenues upon which its very existence and the general welfare depends. To state these basic principles, however, does not end the analysis.
There is no statute in New York which either expressly authorizes or prohibits preliminary injunctions in the context of tax review proceedings. The CPLR provisions relating to injunctions, therefore, should, at least by implication, be available in these situations. (See CPLR 103, subd [b] ; art 63.) However, aside from the Appellate Division’s decision presently under review, research has revealed no other authority in this State which affords guidance in answering the question presented. (Cf. Weber v City of New York, 18 Misc 2d 543.)
Other jurisdictions which have addressed analogous situations have, for the most part, concluded that a court does have the equitable power to enjoin the collection of a tax under certain circumstances. (See, e.g., Kent v Murphey, 207 Ga 707; Clarendon Assoc. v Korzen, 56 Ill 2d 101; Harshberger v Board of County Comrs., 201 Kan 592; Fitzpatrick v Patrick, 410 SW2d 143 [Ky]; Bettigole v Assessors of Springfield, 343 Mass 223; Twenty-Two Charlotte v City of Detroit, 294 Mich 275.) These cases have usually involved situations in which there has been a clear showing of intentional overassessment of property tantamount to fraud on the part of the tax authority and the taxpayer was without relief from the imminent deprivation of his property while he attempted to challenge the unauthorized tax. Absent such intentional misconduct, how *517 ever, these courts have been quick to note that an injunction is not available to avoid an excessive assessment which is the product of inadvertence or mistake and the taxpayer in such instances is left solely to his administrative remedies. (See, e.g., Hodge v Glaze, 22 Ill 2d 294; Harshberger v Board of County Comrs., supra; Bettigole v Assessors of Springfield, supra; see, generally, 84 CJS Taxation, §§ 716-722.)
We would agree that a court has the power to issue a preliminary injunction restraining the enforcement of a tax, but that power should be exercised in only the most unusual circumstances. Where there has been a deliberate misuse of the taxing power, a court should be able to intervene to prevent the threatened loss of the taxpayer’s property occasioned by the imposition of an intentionally excessive tax. Indeed, to adopt a contrary view would relegate the taxpayer to a truly pyrrhic victory. After successfully challenging the assessment levied against him, the taxpayer would be rewarded with a refund at 3% interest (General Municipal Law, § 3-a), but in the meantime the taxpayer’s property would have been sold because of an inability to pay a tax which improperly was imposed in the first instance. Such a temporary restraint does little harm to the taxing authority and at the same time preserves the status quo pending a determination of the amount owed.
Of course, beyond showing an intentional misuse of the taxing power, the taxpayer would have to meet the usual requirements to be entitled to temporary injunctive relief, to wit: (1) the likelihood of success on the merits; (2) irreparable injury absent granting the preliminary injunction; and (3) a balancing of the equities. (See, e.g., Nassau Roofing & Sheet Metal Co. v Facilities Dev. Corp., 70 AD2d 1021; Tucker v Toia, 54 AD2d 322; Albini v Solork Assoc., 37 AD2d 835.) Moreover, the court could require the taxpayer to post an undertaking (CPLR 6312, subd [b]) in order to protect the municipality from loss should the assessment proceedings prove that the preliminary injunction was granted improperly.
The facts in the present case are quite compelling. As noted by the Appellate Division, taxpayers have been paying excessive taxes on the Grant property for over *518 12 years despite court rulings that the assessments were unlawful by reason of overvaluation. Substantial refunds were ordered on two occasions, but the city to date has repaid only a small portion of the taxes it has unlawfully collected. Such an aggravated pattern of misuse of the taxing power might have been sufficient to justify restraining the city from transferring title to the Grant property pending the final determination of the assessment proceedings. Nevertheless, the simple fact of the matter is that the party who obtained the injunction, South Salina Street, Inc., was not the one subjected to this unlawful conduct.
It is well settled that a “plaintiff should be denied an injunction where it lacks equitable standing to obtain affirmative equitable relief”. (Fischel & Co. v Macy & Co., 20 NY2d 180, 187.) However, in this case, South Salina Street, Inc., acquired the Grant property in late 1976 with full awareness of its tax history. Indeed, South Salina Street, Inc., purchased the property at the low price of $25,000 with the understanding that it would assume all tax liability then owing. These taxes were never paid, nor did South Salina Street, Inc., pay taxes on the property for the next three years. Under these circumstances, while Grant may have been entitled to an injunction against the city, South Salina Street, Inc., lacks equitable standing to assert the aggravated pattern of tax abuse to which its predecessor in interest was subject as the basis for injunctive relief. Therefore, we conclude that it was error to issue the injunction in this case.
Accordingly, the orders of the Appellate Division in Grant Co. v Srogi and Guth Realty v Srogi should be affirmed, without costs. The separate order of the Appellate Division in a proceeding also entitled Grant Co. v Srogi affirming the grant of a preliminary injunction should be reversed, with costs, and the motion for preliminary injunction denied. We construe the question certified by the Appellate Division as asking whether a preliminary injunction was properly granted in this case and, as so construed, the question should be answered in the negative.

. As modified by the Appellate Division, the assessment computations are as follows:
Equalization
FuII Value Rate Assessment
Grant Property:
1971-1972 $12,000,000 45% $540,000
1973-1974 950,000 43% 408,500
1975-1976 950,000 40% 380,000
Guth Property:
1971-1972 180,000 45% $ 81,000
1973-1974 150,000 43% 64,500
1975-1976 150,000 40% 60,000

. In response to the dissent, a few comments are in order. Inasmuch as the present appeals involve assessment review proceedings pursuant to article 7 of the Real Property Tax Law, we do not reach and, therefore, need not consider the rule in ordinary civil cases which prohibits recovery in excess of the ad damnum clause of the complaint. Nor do we suggest that in a tax review proceeding the values alleged in the petition are meaningless or that relief is to be granted regardless of the prejudice suffered by the respondent taxing authority. Rather, we merely hold that, under the facts of this case, reformation of the petitions to conform with the proof was a remedy which was within the court’s power to grant and which was not affected by any error of law.